IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )   Case No.
                                   )   10-CR-00348-GAF-1
ARMON THOMPSON,                    )
                                   )
                    Defendant.     )

TRANSCRIPT OF SENTENCING HEARING

On March 7, 2012, the above-entitled cause came on

before the Honorable Gary A. Fenner, United States District

Judge, sitting in Kansas City.

APPEARANCES

For the Plaintiff:        Ms. Jalilah Otto
                          Assistant United States Attorney
                          Charles Evans Whittaker Courthouse
                          400 East Ninth Street, Floor 5
                          Kansas City, Missouri 64106

For the Defendant:        Mr. Stephen C. Moss
                          Assistant Federal Public Defender
                          818 Grand Avenue, Suite 300
                          Kansas City, Missouri 64106

Katherine A. Calvert, RMR
United States District Court Reporter
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri 64106
(816) 512-5741

1

```
              I N D E X                          Page

GOVERNMENT'S EVIDENCE
```

```
DIMECHI HERRING
        Direct examination by Ms. Otto. . . . . . . . . . . .   5
        Cross-examination by Mr. Moss . . . . . . . . . . . .  13
        Redirect examination by Ms. Otto. . . . . . . . . . .  16

SCOTT COATES
        Direct examination by Ms. Otto. . . . . . . . . . . .  19
        Cross-examination by Mr. Moss . . . . . . . . . . . .  30
        Redirect examination by Ms. Otto. . . . . . . . . . .  39
        Recross-examination by Mr. Moss . . . . . . . . . . .  42

JUSTIN JERMAINE CAMPBELL
        Direct examination by Ms. Otto. . . . . . . . . . . .  45
        Cross-examination by Mr. Moss . . . . . . . . . . . .  58
        Redirect examination by Ms. Otto. . . . . . . . . . .  75
        Recross-examination by Mr. Moss . . . . . . . . . . .  76

Reporter's certificate . . . . . . . . . . . . . . . . . .  90
```

Case 4:10-cr-00348-GAF   Document 42   Filed 03/15/12   Page 2 of 90

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| **FOR THE GOVERNMENT:** | | | |
| 1 | Justin Campbell plea agreement | 50 | 50 |
| 2 | Justin Campbell confidential supplement | 50 | 50 |
| 3 | Justin Campbell Kastigar letter | 50 | 50 |
| 4 | Justin Campbell statement | 50 | 50 |
| 7 | Photograph | 8 | 8 |
| 8 | Photograph | 8 | 8 |
| 9 | Photograph | 8 | 8 |
| 11 | Photograph | 8 | 8 |
| **FOR THE DEFENDANT:** | | | |
| 1 | Carolyn Carolina statement | 33 | 33 |
| 2 | 12/1/10 LaKenya Williams statement | 35 | 35 |
| 3 | 11/30/10 LaKenya Williams statement | 35 | 35 |
| 4 | Tacresha Carolina statement | 36 | 36 |
| 5 | Donneta Springer statement | 37 | 37 |
| 6 | Edward G. Becerra statement | 38 | 38 |
| 9 | Affidavit | 77 | 78 |

```
 1                              MARCH 7, 2012

 2               THE COURT:  Government ready, Ms. Otto?

 3               MS. OTTO:  Yes, Your Honor.

 4               THE COURT:  And ready, Mr. Moss?

 5               MR. MOSS:  Yes, Your Honor.

 6               THE COURT:  Thank you.

 7               Mr. Moss, you've had an opportunity to review the

 8    presentence report with Mr. Thompson; is that correct?

 9               MR. MOSS:  Yes, Your Honor.

10               THE COURT:  And I believe you've noted a couple of

11    matters of objection.  Your first is to page 6, paragraph 15,

12    page 7, paragraphs 22 and 23.  You object to the information

13    relating that Mr. Thompson was involved in a shooting as was

14    provided by a jailhouse informant.  I'm not certain whether --

15    and you object to the enhancements that are reflected in

16    paragraphs 22 and 23 as well.

17               Would you like to speak to that any further, Mr.

18    Moss?

19               MR. MOSS:  No, Your Honor.  I do believe the

20    government is prepared to present evidence in support of those

21    enhancements, and we're prepared to present evidence to contest

22    or refute those enhancements.  I don't have anything further to

23    add other than what's in the objections.

24               THE COURT:  Thank you, Mr. Moss.

25               Ms. Otto, do you have something you'd like to offer
```

Case 4:10-cr-00348-GAF   Document 42   Filed 03/15/12   Page 4 of 90

1   on this matter?

2          MS. OTTO:  Yes, Your Honor.  I have three brief

3   witnesses I would like to call to testify.

4          THE COURT:  All right.

5          MS. OTTO:  First I call Special Agent Herring to the

6   stand to testify.

7          THE COURT:  Special Agent, would you come up and

8   raise your right hand to be sworn.

9   DIMECHI HERRING, being sworn by the courtroom deputy,

10  testified:

11  DIRECT EXAMINATION BY MS. OTTO:

12  Q      Can you please state and spell your full name.

13  A      Dimechi Herring, D-i-m-e-c-h-i H-e-r-r-i-n-g.

14  Q      Agent Herring, where are you currently employed?

15  A      Special agent with the Bureau of Alcohol, Tobacco,

16  Firearms and Explosives.

17  Q      How long have you been with the ATF?

18  A      Approximately three and a half years.

19  Q      Can you very briefly tell us what your training and job

20  responsibilities are?

21  A      We investigate federal crimes involving alcohol,

22  tobacco, firearms, explosives, and also narcotics violations.

23  Q      Back in December of 2010, were you involved in the

24  investigation regarding an Armon Thompson?

25  A      Yes, I was.

1   Q      Can you tell the Court briefly how you got involved?

2   A      There was a homicide in St. Joseph, Missouri, and the

3   St. Joseph Police Department requested our assistance in

4   locating a suspect.

5   Q      And were you able to identify a house where a suspect

6   was located?

7   A      Yes, I was.

8   Q      And at that time who was your main suspect for the

9   homicide?

10  A      Calvin Ford.

11  Q      And what location did you identify that Mr. Ford may be

12  located at?

13  A      9732 Elm in Kansas City, Missouri.

14  Q      And that's in the Western District of Missouri?

15  A      Yes, it is.

16  Q      Once you got information that Mr. Ford may be at 9732

17  Elm, what did you guys do?

18  A      We made contact at the individual's residence.

19  Q      Was that back on December 2nd, 2010?

20  A      Yes.

21  Q      And did you locate Mr. Ford at that house?

22  A      Yes, we did.

23  Q      Did you also locate the defendant, Armon Thompson, at

24  that house?

25  A      Yes, I did.

```
 1   Q       And, to your knowledge, Mr. Thompson a convicted felon?

 2   A       Yes.

 3   Q       Do you recall how many firearms were located at 9732

 4   Elm?

 5   A       Four firearms.

 6   Q       Do you recall where those firearms were located?

 7   A       In the basement of the residence.

 8   Q       And was this a finished basement or kind of cement

 9   floor, cement wall basement?

10   A       Finished basement.

11   Q       It had a bathroom, bedroom, closets?

12   A       Yes.  Yes.

13   Q       So the firearms were found in the basement; is that

14   what you said?

15   A       Correct.

16   Q       Where was Mr. Thompson located?

17   A       In the basement.

18   Q       Where was Mr. Ford located?

19   A       Also in the basement.

20   Q       Do you recall what room in the basement Mr. Thompson

21   was located?

22   A       In the main living area of the basement.

23   Q       And where was Mr. Ford also located?

24   A       Also in the main living area of the basement.

25   Q       Do you recall where the firearms were located at in the
```

7

1 basement?

2  A      The .45 pistol we located -- and a rifle were located

3 on the floor in the main living area of the basement under a

4 small table, and the .22 caliber rifle and the .380 caliber

5 pistol were located in the closet.

6  Q      And were photographs taken of the firearms and where

7 they were located?

8  A      Yes, they were.

9  Q      And have you had an opportunity to review those

10 photographs?

11  A      Yes.

12  Q      I'm going to show you what has previously been marked

13 as Exhibits 7 through 11, which defense has a copy as well,

14 tell me if you recognize Exhibits 7 through 11.

15  A      These are the pictures of the basement and the firearms

16 located inside the basement.

17  Q      And do those pictures fairly and accurately depict how

18 the firearms were found and the basement appeared back on

19 December 2nd, 2010?

20  A      Yes, they do.

21          MS. OTTO:  And, Your Honor, I move for admission of

22 Exhibits 7 through 11.

23          MR. MOSS:  No objection.

24          THE COURT:  Those exhibits are received.

25  Q      (By Ms. Otto)  Let's turn specifically to Exhibit

No. 9.  Can you tell us what's depicted in Exhibit No. 9?

A       Exhibit 9 is a photograph of the .380 caliber pistol and .22 rifle that was located in the closet.

Q       And in that closet prior to the photograph, were the guns in plain sight or were things on top of the guns there?

A       There was clothing and various papers on top of both firearms.

Q       And did those papers have any identifying names or characteristics on them?

A       Some of the papers were addressed to Armon Thompson.

Q       Let's turn now to Exhibit No. 11 -- or No. 10.  What is No. 10 showing you?

A       Photograph Exhibit 10 is a photograph of the main living area of the basement.

Q       And is that the main living area you talked about where Mr. Ford and Mr. Thompson were found?

A       Yes.

Q       And Exhibit No. 11.  Is that a close-up of a portion of that main living area?

A       Yes.

Q       And what portion of the room is that?

A       It's the corner of the room where the tables are and it's located with a stereo on top of it and the SKS rifle and .45 caliber pistol were located under the table.

Q       And were they in any type of gun case at all?

9

1    A       No.  They were just laying on the floor.

2    Q       Do you know if the firearms were ever submitted for any

3    DNA or ballistic testing?

4    A       Yes, they were.

5    Q       Let's talk about them individually.  Let's talk first

6    about the guns found in the closet where the paperwork with Mr.

7    Thompson's name was located, the .380 caliber gun.  Was that

8    related to any type of criminal activity that you're aware of?

9    A       Shell casings from the homicide in St. Joseph,

10   Missouri, matched that .380 caliber firearm.

11   Q       And do you know whether or not on that .380 caliber

12   firearm, whether or not they were able to determine if Mr.

13   Thompson's DNA was on that firearm?

14   A       Yes.  They were able to determine if it was on there or

15   not.

16   Q       Well, did it say that it was inconclusive that he was a

17   possible contributor?

18   A       Correct.

19   Q       And, in fact, there was a mixture of different genetic

20   materials to make it difficult to determine if Mr. Thompson was

21   a possible contributor; is that right?

22   A       Correct.

23   Q       And then let's talk about the .22 caliber rifle that

24   was found there as well.  Do you know whether or not he or Mr.

25   Ford were determined to be possible contributors on the ejector

1   on that .22 caliber rifle?

2   A      I believe Mr. Thompson was considered to be a probable

3   contributor to the DNA on the .22 caliber rifle.

4   Q      And then let's talk about the SKS that was found on the

5   floor of the living space of the basement.  Did the homicide --

6   did the ballistics on that gun relate back to any criminal

7   activity?

8   A      Yes.  Shell casings recovered from the homicide in St.

9   Joseph matched the SKS rifle located in the residence.

10  Q      And did the .45 caliber handgun match any kind of

11  criminal activity, to your knowledge?

12  A      There was another shooting in St. Joseph on a female,

13  Genea Weston was shot.  Shell casings recovered from that scene

14  matched the .45 caliber pistol that was located in the

15  residence.

16  Q      And do you know if there were any DNA examinations of

17  that .45 caliber firearm located in the residence?

18  A      Yes, there was.

19  Q      And do you know whether or not Mr. Thompson was

20  included as a possible contributor of the DNA mixture on that

21  .45 caliber gun?

22  A      Yes, he was.

23  Q      And, in fact, it was he -- was the frequency of his

24  alleles in the DNA 1 in 20 unrelated individuals?

25  A      Yes.

```
 1    Q      And let's talk very briefly about Ms. Genea Weston.

 2   You say it was related to a shooting involving Genea Weston in

 3   St. Joseph, Missouri?

 4    A      Correct.

 5    Q      Did Ms. Weston survive that shooting?

 6    A      Yes, she did.

 7    Q      Does she have full capacity as she did prior to that

 8   shooting?

 9    A      I don't believe so.

10    Q      Do you know what the extent of her injuries were

11   related to that shooting?

12    A      No.

13    Q      In addition to finding these firearms in the home, was

14   there also a vehicle that was located at 9732 Elm?

15    A      Yes, a dark blue Chrysler 300 was located in the

16   garage.

17    Q      And did that Chrysler have any significance to the

18   homicide investigation in St. Joseph, Missouri?

19    A      Yes.  Witnesses at the scene identified a dark-colored

20   Chrysler as the vehicle used in the drive-by shooting.

21    Q      Let me go back very quickly.  You guys entered 9732 Elm

22   on December 2nd, 2010; is that correct?

23    A      Correct.

24    Q      Do you remember the date of the homicide?

25    A      Not exactly, maybe November 30, November 30th.
```

```
1    Q      Okay.  So it would have been within 48 hours of the

2    homicide is when you located Mr. Thompson and Mr. Ford at 9732

3    Elm?

4    A      Yes.  We actually were conducting surveillance on the

5    residence prior to December 2nd.  That's just when we made

6    contact with the individuals.

7    Q      And so were you making surveillance on that house hours

8    before you made entry into the house?

9    A      Yes.

10            MS. OTTO:  I don't have anything further at this

11   time.

12            THE COURT:  Mr. Moss, any questions?

13            MR. MOSS:  Yes, Your Honor, just a few.

14   CROSS-EXAMINATION BY MR. MOSS:

15   Q      Good afternoon, Agent Herring.

16   A      Good afternoon.

17   Q      Just have a few questions about some of the firearms

18   that were recovered.  The .38 caliber, you indicated that shell

19   casings from the .38 caliber were found at the scene?

20   A      Yes.

21   Q      And just so -- just so we're clear, we're talking about

22   the Brolin Arms pistol?  Is that the .38 caliber?

23   A      No.  The Bersa is the -- .380 caliber, not .38 caliber.

24   Sorry.

25   Q      Okay.  So the .380 caliber is the Bersa?
```

1    A       Correct.

2    Q       And I believe you indicated that there was no evidence

3    of Mr. Thompson's DNA found on that firearm; is that correct?

4    A       Correct.  I don't believe the lab could make a decision

5    on that.

6    Q       Okay.  Well, the lab did determine that Calvin Ford was

7    a potential contributor of DNA to that Bersa?

8    A       Correct.

9    Q       Okay.  So they found potentially Calvin Ford's DNA but

10   not Mr. Thompson's?

11   A       Correct.

12   Q       I think you also testified regarding the .22 caliber

13   Mitchell Arms rifle found in the closet?

14   A       Yes.

15   Q       And there was evidence that Mr. Thompson's DNA or he

16   was a potential contributor to DNA on that .22 caliber?

17   A       Correct.

18   Q       And the SKS, that's the Norinco rifle that was found

19   beside the .380 Bersa; is that correct?

20   A       It was found beside the Brolin Arms .45 caliber.

21   Q       I'm sorry.  It was found beside the Brolin Arms.

22   That's depicted in Government's Exhibit 11?

23   A       Yes.

24   Q       Okay.  And there was no evidence that Mr. Thompson's

25   DNA was connected to that firearm at all?

```
 1   A      We're talking about the SKS?

 2   Q      The SKS, yes.

 3   A      Correct.

 4   Q      Okay.  And just for our purposes, those are -- the

 5   Brolin Arms and the Norinco, those are the ones that are

 6   connected to this St. Joe shooting that occurred on

 7   November 30th?

 8   A      No.  The SKS and the Bersa .380 pistol were connected

 9   with the homicide.

10   Q      Well, when you -- okay.  I'm a little bit confused

11   here.  I apologize.

12          The Bersa is the .45 caliber?

13   A      No.  The Bersa is the .380 caliber.  The Brolin Arms is

14   the .45 caliber.

15   Q      Okay.  And Defense Exhibit 11 -- I'm sorry --

16   Government's Exhibit 11 reflects the Norinco SKS and the Bersa

17   .45; is that correct?

18   A      Brolin Arms .45.

19          THE COURT:  Wait a minute.  Exhibit 11, that's the

20   living room.  So that's the SKS and the .45?  Is that correct?

21          THE WITNESS:  Yes.  Yes, sir.

22   Q      (By Mr. Moss)  All right.  I'll try to clarify.  Sorry

23   for my confusion.

24          Both the Bersa and the SKS, those had some

25   connection to the St. Joe homicide?
```

1   A       Yes.

2   Q       And none of Mr. Thompson's DNA was linked to either of

3   those firearms; is that correct?

4   A       Correct.

5   Q       Okay.  Are you the case -- were you involved in

6   the investigation of interviewing witnesses?  I know you

7   assisted -- ATF assisted St. Joe.  Did you assist in the

8   interview of witnesses following this incident?

9   A       Involved in the homicide?

10  Q       Yes.

11  A       No.

12  Q       Have you had a chance to review witness statements,

13  written witness statements from people that were there where

14  the shooting occurred?

15  A       No.

16  Q       Okay.

17          MR. MOSS:  That's all the questions I have.  Thank

18  you.

19          THE COURT:  Ms. Otto.

20  REDIRECT EXAMINATION BY MS. OTTO:

21  Q       Just very briefly so we're clear on what firearms were

22  found.  In the closet the .22 caliber rifle was found; is that

23  correct?

24  A       Correct.

25  Q       Along with the .380 that was linked to the homicide; is

16

1    that correct?

2    A       Correct.

3    Q       And that's the Bersa; is that correct?

4    A       Correct.

5    Q       And have you had an opportunity to review the report,

6    the DNA report, in this case?

7    A       Yes.

8    Q       And I'm going to ask you a question.  If you need to

9    refresh your recollection, just let me know.  On that Bersa

10   .380 that was located in the closet related to the homicide in

11   St. Joseph, was there a mixture of at least three contributors

12   on that Bersa .380 pistol?

13   A       Yes, I believe so.

14   Q       And was the last saying inconclusive to determine

15   whether or not Mr. Thompson was a possible contributor of that

16   .380?

17   A       Correct.

18   Q       And so -- then also let's turn to the two firearms that

19   were found in the living room under the table -- under the

20   living space under the table that was located.  That was the

21   SKS rifle; is that correct?

22   A       Correct.

23   Q       That was related to the homicide, correct?

24   A       Correct.

25   Q       And there also was a .45 caliber handgun by Brolin; is

1    that correct?

2    A        Correct.  Brolin Arms.

3    Q        Brolin Arms.  And the laboratory did an analysis on the

4    .45 caliber Brolin Arms, correct?

5    A        Correct.

6    Q        And did that also determine that there were at least

7    three contributors on that firearm?

8    A        I believe so.

9    Q        And is that where Mr. Thompson was 1 in 20, his alleles

10   occurred at a frequency of 1 in 20 unrelated individuals?

11   A        Correct.

12   Q        And that .45 caliber Brolin Arms gun was related to the

13   shooting of Genea Weston?

14   A        Correct.

15   Q        And then the SKS, there was a number of contributors on

16   that rifle; is that correct?

17   A        Correct.

18            MS. OTTO:  Nothing further, Your Honor.

19            THE COURT:  Mr. Moss.

20            MR. MOSS:  Just, briefly, Your Honor.

21            Again, I'm confused.  Do you have a copy of the DNA

22   report?  I was just wondering if it was the same one I have.

23            I don't have any further questions, Your Honor.

24            THE COURT:  Thank you.

25            Thanks, Special Agent.  You can return to your seat.

18

```
 1              (Witness excused.)
 2              MS. OTTO:  Your Honor, I would like to call
 3   Detective Scott Coates.
 4   SCOTT COATES, being sworn by the courtroom deputy, testified:
 5   DIRECT EXAMINATION BY MS. OTTO:
 6   Q      Good afternoon.
 7   A      Good afternoon.
 8   Q      Would you please state and spell your full name.
 9   A      Scott, S-c-o-t-t; Coates, C-o-a-t-e-s.
10   Q      Mr. Coates, where are you currently employed?
11   A      I'm employed by the City of St. Joseph, Missouri Police
12   Department.
13   Q      And what's your current job title?
14   A      I'm a detective.
15   Q      And as a detective, what is some of your
16   responsibilities?
17   A      I investigate crimes that occur in the midtown area,
18   anywhere from vandalisms up to homicides.
19   Q      And you said the midtown area of St. Joseph.  Can you
20   give us street parameters on what that means?
21   A      My specific geographic area covers 13th Street to 28th
22   Street, from Messanie Street up to Grand Avenue in St. Joseph.
23   Q      And the district that you're detective over, is that
24   all over the Western District of Missouri?
25   A      It is.
```

1    Q       Can you tell briefly about some of your training to

2    become a detective with St. Joseph?

3    A       I've had numerous trainings, including new investigator

4    training put on by the Public Agency Council.  I've attended

5    numerous homicide investigation trainings as well as I'm the

6    polygraphist for our department as well so I attended polygraph

7    training as well.

8    Q       I'm going to ask you some questions about a homicide

9    that was investigated back on November 30th of 2010.  Were you

10   involved in the investigation of that homicide?

11   A       Yes, I was.

12   Q       Do you recall the name of the victim in that case?

13   A       It was Jordan Bartram.

14   Q       And do you recall the location of that homicide?

15   A       It was the 2900 block of Lafayette.

16   Q       And that was within the midtown district you discussed?

17   A       It was outside of my specific geographic area but just

18   by a few blocks.

19   Q       Okay.  Do you recall approximately what time the St.

20   Joseph Police Department was dispatched to that homicide scene?

21   A       I don't remember the exact time.  I know it was shortly

22   after 10 p.m.

23   Q       On November 30th?

24   A       Yes.

25   Q       And do you know if there were any victims in addition

1    to Jordan Bartram, the victim?

2    A       No one else that was struck.

3    Q       During part of your investigation of this homicide, was

4    there a collection of evidence there from the 2900 block of

5    Lafayette?

6    A       Yes, there was.

7    Q       Do you know if any shell casings were recovered on the

8    2900 block of Lafayette?

9    A       Yes, there were.

10   Q       Could you tell us briefly what was recovered?

11   A       There were Fiocchi 7.62 by 39 rounds that were

12   recovered, as well as some Winchester .380 ought shell casings.

13   I also know there was a 9 millimeter shell casing that was also

14   recovered but it appeared to be somewhat outside the scene.

15   Q       So the 9 millimeter shell casings, that wasn't directly

16   in close proximity to the homicide scene; is that what you are

17   saying?

18   A       Correct.

19   Q       Then the 3 -- I'm sorry.  The 7.62 by 39 millimeter,

20   what type of firearm fires that type of shell casings?

21   A       An SKS rifle.

22   Q       And then you also mentioned there were some .380,

23   Winchester .380 shell casings.  What type of firearm fires that

24   type of ammunition?

25   A       Generally a .380 auto.

1    Q      During the course of your investigation, were you guys
2    able to speak with any witnesses?
3    A      Yes, we were.
4    Q      And specifically did you speak with an individual named
5    LaKenya Williams?
6    A      Yes, I did.
7    Q      And do you recall if Ms. Williams was able to give you
8    a description of the vehicle involved in the homicide?
9    A      Yes, she did.
10   Q      And what description did she give you?
11   A      She gave me a dark-colored four-door vehicle which she
12   believed was a Chrysler with tinted windows.
13   Q      And did she indicate where she was located during the
14   homicide and was able to see this vehicle?
15   A      She was in the -- inside the same vehicle that Mr.
16   Bartram was in parked in front of the house in the 2900 block
17   of Lafayette.
18   Q      Let's back up real quick.  Just tell us the nature of
19   the homicide, where the victim was located when officers came
20   to the scene?
21   A      Our victim was located in the front driver's seat of
22   her vehicle, which was -- again, it was parked in the 2900
23   block of Lafayette Street on the north side of the street.
24   Q      And, in fact, was it parked in front of 2909 Lafayette
25   Street?

|      |   |                                                              |
|------|---|--------------------------------------------------------------|
| 1    | A | Pretty close, yes.                                           |
| 2    | Q | Did that house have any significance to you as a            |
| 3    |   | detective with the St. Joseph Police Department?            |
| 4    | A | Yes, it did.                                                |
| 5    | Q | And what did the significance of that house have?           |
| 6    | A | We knew that house to be associated with individuals        |
| 7    |   | that had been involved in an ongoing dispute between        |
| 8    |   | different -- with a different group of people in our town.  |
| 9    | Q | Okay.  And do you know who lived at 2909 Lafayette?         |
| 10   | A | The Carolina family, Carolyn Carolina and several          |
| 11   |   | members of her family.                                      |
| 12   | Q | Do you know the names of the people they were disputing    |
| 13   |   | with?                                                        |
| 14   | A | Those people were involved in a dispute with people        |
| 15   |   | that were associated with an 1800 Gang in our city.         |
| 16   | Q | And Calvin Ford, to your knowledge, a member of that       |
| 17   |   | gang?                                                        |
| 18   | A | Yes.                                                        |
| 19   | Q | And, to your knowledge, Calvin Ford associated with        |
| 20   |   | Armon Thompson?                                             |
| 21   | A | Yes.                                                        |
| 22   | Q | Now, when you spoke with Ms. LaKenya Williams, did she     |
| 23   |   | indicate whether or not she was able to determine how many |
| 24   |   | people were in the car?                                     |
| 25   | A | She didn't say specifically.  She said there were          |

1   several people in the car.  I believe she mentioned around four

2   or five people in the car.

3   Q       And did she indicate how many people were shooting at

4   her car?

5   A       She indicated she heard two different guns being fired,

6   and she specifically indicated seeing one weapon in Calvin

7   Ford's hand and said that another gun was being fired as well.

8   Q       Did Ms. Williams tell you who Mr. Ford would associate

9   with?

10  A       Yes, she did.

11  Q       Did she tell you who those people were?

12  A       She mentioned Armon Thompson, Brian Brewer, and some

13  other names.

14  Q       And did she also give a nickname that Mr. Thompson goes

15  by?

16  A       Bin Ladin.

17  Q       Bin Ladin?

18  A       Yes.

19  Q       Like Osama bin Ladin?

20  A       Yes.

21  Q       She indicated she knew Mr. Ford and Mr. Thompson to be

22  associates?

23  A       Yes, she did.

24  Q       In addition to speaking -- I'm sorry.  In addition to

25  speaking with Ms. Williams, did you also speak with a woman

1   named Stephanie Ishmael?

2   A      Yes, I did.

3   Q      Can you tell us what significance Ms. Ishmael had to

4   this case?

5   A      Yes.  We received information that her vehicle was the

6   vehicle used in the homicide of Ms. Bartram and we made contact

7   with Ms. Ishmael, and she gave us specific information about

8   the description of her vehicle and people who had her vehicle.

9   Q      Okay.  Who did she indicate had her vehicle back on

10  November 30th of 2010?

11  A      Calvin Ford and a friend of his.

12  Q      Did she give you a description, physical description

13  for the friend of his?

14  A      Yes, she did.

15  Q      What was that physical description?

16  A      She said he was a small black male, thin built with

17  braids.

18  Q      Did she say whether or not Mr. Ford or Mr. Thompson

19  appeared to be related or close friends?

20  A      I believe she told me that Mr. Ford had told her they

21  were brothers.

22  Q      And did she indicate that she had given her vehicle to

23  Mr. Ford and his friend slash brother?

24  A      Yes, she did.

25  Q      Did she say how long -- or when did they bring the

1    vehicle back to her?

2    A       They did not bring the vehicle back.

3    Q       When was the last time she saw the two of them with her

4    vehicle?

5    A       She was dropped off at her place of employment, which

6    was McDonald's in the middle of R Belt Highway, and she was

7    dropped off somewhere between 3:30 and four o'clock.  She told

8    us that she had forgotten some deodorant, and so she had them

9    return shortly after she had been there to bring her some

10   deodorant to be used.  So that was the last time she had seen

11   her vehicle on that day.

12   Q       Okay.  The individual who brought her deodorant was

13   that Mr. Ford or the friend?

14   A       That was the friend.

15   Q       A description of the friend, does that match the

16   physical description of Armon Thompson?

17   A       Yes, it does.

18   Q       And was Ms. Ishmael's car later recovered at 9732 Elm

19   here in Kansas City, Missouri?

20   A       Yes, it was.

21   Q       Did you also have occasion to speak with a Justin

22   Campbell?

23   A       Yes, I did.

24   Q       And tell us how you first got involved with speaking

25   with Justin Campbell?

```
 1   A        I was contacted by one of our county prosecutors who

 2   was actually handling a case against Mr. Ford.  He relayed to

 3   me he had spoken with this Justin Campbell's attorney and that

 4   he may have some information regarding a homicide in St.

 5   Joseph.

 6   Q        And did you learn where Mr. Campbell was located?

 7   A        Yes, I did.

 8   Q        Where was he located?

 9   A        St. Claire County jail in Missouri, in Osceola,

10   Missouri.

11   Q        And did you travel to Osceola, Missouri, to see Mr.

12   Campbell?

13   A        Yes.

14   Q        Was that back on October 20th of 2011?

15   A        Yes, it was.

16   Q        What did Mr. Campbell tell you?

17            MR. MOSS:  At this point I would like to lodge an

18   objection on the basis of hearsay.  I anticipate that Mr.

19   Campbell is here and is going to be called as a witness so we

20   believe it would constitute hearsay.  We'd ask that -- it's

21   cumulative of his anticipated testimony as well.  So we'd ask

22   the Court just to defer hearing what Mr. Campbell has to say

23   until he's under oath.

24            THE COURT:  I'll take your objection with the

25   evidence, and we'll see if Mr. Campbell testifies.  Thank you.
```

1    Q       (By Ms. Otto)  What did Mr. Campbell tell you?

2    A       He told us that he said that he had been housed with

3    Armon Thompson in the St. Claire County jail for a period of

4    time.  He said during that time Mr. Thompson had a conversation

5    with him indicating that he was involved in a drive-by shooting

6    in St. Joseph.  He told me that Mr. Thompson told him that he

7    was with a friend of his named Calvin and that Calvin had been

8    charged with the murder in that case and that they had gone

9    back to Kansas City to his house where they were both later

10   arrested and several firearms were recovered in that residence

11   and that he made the comment, Mr. Campbell said that Armon had

12   told him that he had hoped his fingerprints or DNA didn't come

13   back on those weapons.

14   Q       When speaking to Mr. Campbell, did he tell you anything

15   that was corroborated what you already knew about the homicide

16   involving Calvin Ford?

17   A       Yes.  We corroborated several different things.  The

18   physical evidence in the crime indicated that there were

19   multiple weapons that were fired, including these weapons that

20   were recovered at Mr. Thompson's house.  He had also told us

21   that there was a female witness in that case who he had

22   hoped -- he had understood had left town and hoped that she

23   wouldn't testify, and that was also part of this case that we

24   had the female witness who had given us this statement.

25   Q       Which witness was that?

1  A      That was LaKenya Williams.

2  Q      So did she in fact move out of town during the course

3  of this?

4  A      She did for a period of time, yes.

5  Q      And did Mr. Thompson have any kind of association with

6  Ms. Williams to know whether or not she moved out of town?

7  A      I'm not aware of what his association would have been

8  after his arrest, but my understanding from Ms. Williams was

9  that she and Armon Thompson had had a relationship at least at

10 some point in time.

11 Q      Okay.  And when you spoke to Mr. Campbell, tell me what

12 his demeanor was like.

13 A      He was nervous.  He expressed concern about his safety

14 and well-being should Mr. Thompson find out that he had given

15 this information.

16 Q      And did you make any promises to Mr. Campbell?

17 A      No.

18 Q      And let me go back very briefly to that McDonald's

19 where Ms. Stephanie Ishmael worked.  Did you ever have a chance

20 to review any videotape footage from that McDonald's?

21 A      Yes, I did.

22 Q      And what did you learn from reviewing that videotape

23 footage?

24 A      During my review of that video, there was a period of

25 time -- I don't remember the specific time frame.  I know it

1  was during the time frame between 3:30 and 4:20 in the

2  afternoon of November 30th where Ms. Ishmael had been dropped

3  off at McDonald's a vehicle leaves.  That vehicle returns

4  during this time frame that I'm speaking of, backs into the

5  parking spot on the north side of the building, and a black

6  male subject walks into the lobby, waits for a short period of

7  time, then hands Ms. Ishmael something before leaving.

8  Q      Were you able to identify who that black male was on

9  the videotape?

10 A      Not specifically, no.

11 Q      Did that black male match the description, physical

12 description of Armon Thompson?

13 A      Yes.

14 Q      And have you had an opportunity to interview Mr.

15 Thompson in relation to the homicide?

16 A      We made an attempt to do that.

17 Q      Okay.  And were you able to do that?

18 A      No.

19        MS. OTTO:  I don't have any further questions.

20        THE COURT:  Mr. Moss.

21 CROSS-EXAMINATION BY MR. MOSS:

22 Q      Detective Coates, I understand you testified that you

23 reviewed a videotape and the suspect matched the description of

24 Mr. Thompson; is that correct?

25 A      That's correct.

```
 1    Q       Are you identifying that person as Mr. Thompson today

 2    in court?

 3    A       No, I'm not.

 4    Q       Okay.  So you did review the videotape and you're able

 5    to see?  Is it a clear picture on the videotape?

 6    A       The video is shot from behind where the individual in

 7    the restaurant was so you couldn't get a clear picture of who

 8    this person is.

 9    Q       Okay.  I mean, how -- just from looking at the

10    videotape, how would you describe the person?

11    A       This person was a smaller framed black male with braids

12    and wearing a ball cap.

13    Q       A ball cap?

14    A       Yes.

15    Q       Was it in color or was it in black and white?

16    A       It was in color.

17    Q       Okay.  Detective, I'd like to --

18            MR. MOSS:  Your Honor, may I approach the witness?

19            THE COURT:  Yes.

20    Q       (By Mr. Moss)  Let me show you what's been marked, in

21    which the government has a copy, of Defense Exhibits 1, 2, 3,

22    4, 5, and 6 and just have you look over these, if you would,

23    and tell me if you recognize them.  Once you're, done let me

24    know.

25    A       Okay.
```

```
 1   Q      Detective, you have seen those exhibits before, right?

 2   A      Yes, I have.

 3   Q      Okay.  If I could, I'm going to try to lead you through

 4   each of them; but if you would look at Defense Exhibit 1 --

 5   hopefully they're still in the correct order -- is that a

 6   witness statement from Carolyn Carolina that was taken on

 7   December 1st?

 8   A      Yes, it is.

 9   Q      And that was made to a Detective Adams?

10   A      That's correct.

11   Q      Do you know Detective Adams was an officer involved in

12   the investigation?

13   A      Yes, he was.

14   Q      And in that written statement on the second page of

15   that is it fair to say that LaKenya identifies Calvin Ford as

16   being involved in that shooting?

17   A      Yes.

18   Q      And I believe she also indicates a person named Brian

19   Brewer that was in the car with Calvin?

20   A      That's correct.

21   Q      And I think she also indicates that four or five other

22   people were in the car as well?

23   A      Yes, she does.

24   Q      And at least in this written statement there's no

25   mention of Armon Thompson, correct?
```

1    A      That's correct.

2           MR. MOSS:  Judge, I move for admission of Defense

3    Exhibit 1.

4           MS. OTTO:  No objection, Your Honor.

5           THE COURT:  Received.

6    Q      (By Mr. Moss)  And if we take a look at Defense

7    Exhibit 2, that's a written statement from LaKenya Williams

8    that was made on December 1st as well?

9    A      Yes, it is.

10   Q      Okay.  And that one was actually made to you the next

11   day after the shooting?

12   A      Yes, it was.

13   Q      And in that statement she indicates again that Calvin

14   Ford was the driver?

15   A      That's right.

16   Q      Is that right?

17   A      Yes.

18   Q      Okay.  And when she talks about the shots being fired,

19   she says she heard about 12 shots, the shots stopped for a

20   second, then she heard three more shots; is that correct?

21   A      Yes.  That's correct.

22   Q      So I mean from your reading of this, is it fair to say

23   that it appears the shots were not -- I know there's testimony

24   that it sounded like different guns, but does it appear from

25   this statement that there was shooting from one gun, a pause of

1   a few seconds, then more shots from a different gun?

2   A      I would say that's fair to say that the two guns being

3   shot were not, according to her, not being shot at the exact

4   same time.

5   Q      Okay.  And in this statement she doesn't mention

6   anything about Armon Thompson, correct?

7   A      That's correct.  She mentioned it in a previous

8   statement, yes.

9   Q      Okay.  And let's move on to Defense Exhibit 3.  That's

10  a statement to an Officer Pearl, correct?

11  A      That's correct.

12  Q      That's another written statement of LaKenya Williams?

13  A      Yes.

14  Q      And in this one she says she's pretty sure it was

15  Calvin Ford but not positive, correct?

16  A      That's correct.

17  Q      Then she mentions -- she doesn't -- I know she mentions

18  other people's names, but she doesn't identify Mr. Thompson as

19  a person that was in the car with Calvin Ford?

20  A      No, she doesn't in that statement.

21  Q      She then goes on to mention known associates of Calvin

22  Ford?

23  A      That's right.

24  Q      And one of those associates, she does mention the

25  defendant, Armon Thompson; is that correct?

```
 1   A       Yes.

 2   Q       And she mentions a person named Darrell Green?

 3   A       Yes.

 4   Q       And Duran Hughes, that's a third -- another person she

 5   mentions?

 6   A       Right.

 7   Q       And she mentions a Tyrone Purcell?

 8   A       Yes.

 9   Q       And she mentions a Warren Hayes?

10   A       Yes.

11   Q       And she also mentions a Tyrell Page?

12   A       That's correct.

13   Q       She said, But she didn't see anyone but Calvin this

14   time; is that right?

15   A       That's right.

16   Q       Okay.  If we could move on to --

17           MR. MOSS:  First of all, I guess I'll move for

18   Defense Exhibits 2 and 3 if I neglected to do that.

19           MS. OTTO:  No objection, Your Honor.

20           THE COURT:  Received.

21   Q       (By Mr. Moss)  Okay.  Defense Exhibit 4 is a written

22   statement from Tacresha Carolina?

23   A       Yes.

24   Q       And this was given to a Detective Lewis, also an

25   officer or detective involved in the investigation?
```

1   A       Yes.  That's true.

2   Q       Okay.  And she indicated that she saw flashes of

3   gunfire coming from the driver's side of the car; is that

4   correct?

5   A       Correct.

6   Q       And specifically gunfire coming from the driver's

7   window?

8   A       Right.

9   Q       And she doesn't mention seeing gunfire from the

10  backside passenger window.  She only mentions seeing gunfire

11  out of the driver's window; is that correct?

12  A       That's correct.

13  Q       Now, she's not -- she doesn't know who was in the car;

14  is that correct?

15  A       That's right.

16  Q       She does, however -- she did hear someone else mention,

17  I guess it was LaKenya again, identify Calvin as being the

18  driver of the vehicle; is that correct?

19  A       Yes.  That's right.

20          MR. MOSS:  Judge, I move for admission of Defense

21  Exhibit 4.

22          MS. OTTO:  No objection.

23          THE COURT:  Received.

24  Q       (By Mr. Moss)  Okay.  If I could -- Defense Exhibit 5

25  is a written statement of Donneta Springer and that was made to

36

1    Detective Lewis?

2    A       Yes.  That's right.

3    Q       Okay.  And, again, if you look at the very first, she

4    describes hearing initially 12 gunshots and then a couple of

5    seconds of a pause, then more gunshots; is that correct?

6    A       That's correct.

7    Q       So, again, at least there's one additional witness that

8    indicates that the shots were sequential rather than at the

9    same time?

10   A       Correct.

11   Q       And that's consistent with the way LaKenya described

12   the gunshots, there being some rapid shots, then a pause, then

13   some more shots?

14   A       Correct.

15   Q       Okay.

16           MR. MOSS:  Judge, I move for admission of Defense

17   Exhibit 5.

18           MS. OTTO:  No objection.

19           THE COURT:  Received.

20   Q       (By Mr. Moss)  Okay.  Then lastly, Defense Exhibit 6.

21   That is a statement, written statement of Edward Becerra made

22   to Detective Green; is that correct?

23   A       Yes.  That's right.

24   Q       And, again, this person was watching television while

25   this incident occurred?

1    A       Correct.

2    Q       And this person heard five or six gunshots real fast, a

3    small pause, then several more gunshots?

4    A       Yes.

5    Q       And that would be consistent with what LaKenya Williams

6    testified to and Donneta Springer testified to?

7    A       That's correct.

8            MR. MOSS:  Judge, we move for admission of Defense

9    Exhibit 6.

10           MS. OTTO:  No objection.

11           THE COURT:  Received.

12   Q       (By Mr. Moss)  And out of all of these witnesses that

13   were interviewed -- and there were other witnesses interviewed

14   at the scene; is that correct?

15   A       I believe so, yes.

16   Q       Did any of those witnesses identify Armon Thompson as

17   being inside that car?

18   A       No.

19   Q       And you testified regarding Stephanie Ishmael, there

20   being a personal videotape that you thought could match the

21   description of Mr. Thompson?

22   A       That's right.

23   Q       But that was at about 4 p.m. that afternoon, correct?

24   A       Yes.  Shortly after four, yes.

25   Q       The shooting in this case happened around 10 p.m. that

1    night?

2     A       That's correct.

3     Q       And there's no information that Ms. Ishmael saw or had

4    anything to do with either Calvin Ford or Mr. Thompson or

5    anyone else from 4 to 10 p.m.?

6     A       That's right.

7                MR. MOSS:  Could I have one second, Your Honor?

8                THE COURT:  Yes.

9                MR. MOSS:  Judge, I don't have any further questions

10   of Detective Coates.  I do -- would have some cross-examination

11   regarding Campbell's statement in the event they do not call

12   Mr. Campbell, but I'll reserve that until he testifies.  If

13   not, I'll just recall Detective Coates.

14               THE COURT:  All right.  That will be fine.  Thank

15   you, Mr. Moss.

16               Ms. Otto.

17               MS. OTTO:  Yes, just very briefly, Your Honor.

18   REDIRECT EXAMINATION BY MS. OTTO:

19    Q       Look at the Defendant's Exhibit 1, statement of Carolyn

20   Carolina.  When she says that they shot up the car and she said

21   it was Calvin Ford and Brian Brewer, she's just relaying what

22   Ms. LaKenya Williams said that night?

23    A       That's right.

24    Q       Ms. Carolyn Carolina didn't actually eyewitness the

25   shooting; is that right?

1   A       That's right.

2   Q       And then with regard to LaKenya Williams -- and let's

3   just flush out her role that night at the homicide scene.  Was

4   there a child there during the homicide scene?

5   A       Yes, there was.

6   Q       Tell me about this child, how old the child was.

7   A       This was, I believe, a four-year-old child that was in

8   the backseat of the vehicle that was shot.

9   Q       And what did LaKenya say she was doing when she first

10  heard the shots firing?

11  A       She was telling everyone to get down, then she tried to

12  get the four-year-old down on the floor so that the child

13  wasn't shot.

14  Q       And when Mr. Moss was asking about two different guns,

15  if you look at page 2 of Exhibit No -- Defense Exhibit No. 2

16  where she says, It sounded like two different guns because I

17  could hear different sounds.  I heard about 12 shots.  The

18  shots stopped for a second.  Then I heard three more shots.

19  She doesn't say that all of the first 12 shots came from one

20  gun and the subsequent three shots came from a separate gun,

21  did she?

22  A       No, she did not.

23  Q       And then after that, she says that she grabbed the

24  child and ran into the house; is that right?

25  A       That's right.

1   Q      And on Exhibit No. -- Defense Exhibit No. 3, Mr. Moss

2   was reading from that statement and ran down a list of names of

3   Calvin Ford's associates, and just a couple things to point

4   out.  On page 2 of Exhibit 3 she indicates that Calvin Ford,

5   she knows he has a lot of problems with her family?

6   A      That's right.

7   Q      Is her family the Carolina family at 2909 Lafayette?

8   A      Yes, it is.

9   Q      She goes on in the next sentence, Calvin is a member of

10  the 1800 Gang with Armon?

11  A      Yes.

12  Q      Unknown last name?

13  A      Right.

14  Q      And she says they call him Bin Ladin?

15  A      That's correct.

16  Q      Then she also listed out the name of the individuals

17  that Mr. Moss read off earlier.  Then she goes on to say,

18  Usually Calvin and Armon are the ones shooting at people?

19  A      Yes.

20  Q      And she says she didn't see Calvin -- I'm sorry.  But

21  she didn't see anyone but Calvin at that time?

22  A      That's correct.

23  Q      She also said there were several people in the car?

24  A      Yes, she did.

25  Q      She also indicated that Ms. Williams had a previous

1    relationship with Mr. Thompson?

2     A       Yes, that was my understanding from my interview with

3    her.

4     Q       Did you ever learn whether or not Mr. Thompson knew any

5    of Mrs. Williams' relatives or family members?

6     A       No.

7     Q       Okay.

8              MS. OTTO:  Nothing further.

9              THE COURT:  Mr. Moss.

10   RECROSS-EXAMINATION BY MR. MOSS:

11    Q       Detective, I understand that there was some shell

12   casings recovered from the scene of the offense; is that

13   correct?

14    A       Yes.

15    Q       And there were some SKS shell casings recovered?

16    A       Yes.

17    Q       How many SKS shell casings were recovered, if you know?

18    A       I don't remember.

19    Q       Hearing 12 shots in rapid succession, would that be

20   consistent with the type of gunfire you might expect from an

21   SKS?

22    A       Yes.

23    Q       Certainly an SKS could fire 12 rounds in rapid

24   succession?

25    A       Yes.

```
 1   Q       And there were also shells from the Bersa pistol.
 2   Those were found at the scene as well?
 3   A       That's right.
 4   Q       Do you know how many?
 5   A       I don't remember without looking at a report, no.
 6           MR. MOSS:  Could I have one second, Your Honor?
 7           THE COURT:  Yes.
 8           MR. MOSS:  Nothing further, Your Honor.
 9           THE COURT:  Ms. Otto, anything -- I'm sorry.
10   Anything further of Detective Coates?
11           MS. OTTO:  No, Your Honor.
12           THE COURT:  Thank you, sir.  You can return to your
13   seat.
14           (Witness excused.)
15           MS. OTTO:  Your Honor, may Mr. Moss and I approach?
16           THE COURT:  Yes.
17           MS. OTTO:  I was going to ask -- Mr. Campbell had
18   concerns about his safety.  So I was going to ask if the Court
19   would be willing to clear the courtroom while he testified in
20   this matter.
21           THE COURT:  Is he in custody?
22           MS. OTTO:  He is in custody, yes.
23           MR. MOSS:  Judge, I understand the concern.  These
24   people are family of Mr. Thompson.  I don't know of anyone
25   that's related to anyone else.
```

```
 1                    THE COURT:  Is there somebody from the press here

 2       too?

 3                    MR. MOSS:  Not that I know of.  I'm not sure.

 4                    THE COURT:  I wonder if he's somebody from the paper

 5       up in St. Joe.

 6                    MS. OTTO:  I could ask him.  My concern is really

 7       for the --

 8                    THE COURT:  You want to go back and find out who the

 9       other person is?

10                    MS. OTTO:  He's Judge Larsen's intern.  So we're

11       just asking for the safety purposes for Mr. Campbell.

12                    THE COURT:  I'm going to grant the request.

13                    I'm going to ask that everyone who is in the gallery

14       leave during the testimony of this next witness, and you'll be

15       told when you can come back in.  And that does not apply to

16       Judge Larsen's clerk.

17                    Thank you.

18                    MR. MOSS:  Judge, can we approach?

19                    (Counsel approached the bench and the following

20       proceedings were had:)

21                    THE COURT:  Yes.

22                    MR. MOSS:  I need to make a record on that.  I don't

23       know that I did.  But I do object.  I do think it is a public

24       hearing.  As I indicated, I don't think these people are all

25       family members or friends of Mr. Thompson.  I don't think
```

44

```
 1   there's any evidence of them being in a position to threaten or
 2   harm Mr. Campbell.  Just so my objection's clear, Your Honor.
 3             THE COURT:  I appreciate that.  The allegations are
 4   that he was a gang member and was involved in drive-by
 5   shootings so I'm going to overrule your objection.  Thank you.
 6             MS. OTTO:  Your Honor, just while we're up here.  As
 7   far as Mr. Moss made an objection about some statements about
 8   Mr. Campbell when Detective Coates was on the stand.  Obviously
 9   he is going to testify now and so I just wanted to make that
10   record as well.
11             THE COURT:  All right.  Thanks.
12             (The proceedings returned to open court.)
13             Bring Mr. Campbell in.
14             MS. OTTO:  We would call Justin Campbell.
15             THE COURT:  Mr. Campbell, before we begin, would you
16   stand up, raise your right hand, and receive an oath from my
17   clerk.
18   JUSTIN JERMAINE CAMPBELL, being sworn by the courtroom deputy,
19   testified:
20             THE COURT:  Ms. Otto.
21   DIRECT EXAMINATION BY MS. OTTO:
22   Q      Good afternoon.  Mr. Campbell, can you please state
23   your full name.
24   A      Justin Jermaine Campbell.
25   Q      And are you familiar with an individual named Armon
```

| 1 | | Thompson? |
| 2 | A | Yes. |
| 3 | Q | And how do you know Armon Thompson? |
| 4 | A | He was my cellee. |
| 5 | Q | And when you say he was your cellee, what does that |
| 6 | | mean? |
| 7 | A | He was my cellmate. |
| 8 | Q | And where was he your cellmate at? |
| 9 | A | St. Claire County. |
| 10 | Q | And when was that? |
| 11 | A | Maybe about six, seven months ago. |
| 12 | Q | And how long was he your cellmate for? |
| 13 | A | About two months. |
| 14 | Q | Do you see Mr. Thompson in the courtroom today? |
| 15 | A | Yes. |
| 16 | Q | And where is he located and what is he wearing? |
| 17 | A | Orange. |
| 18 | Q | And you're pointing over to the defense counsel table |
| 19 | | indicating a man in an orange jumpsuit? |
| 20 | A | Yes. |
| 21 | | MS. OTTO: May the record reflect he's identified |
| 22 | | the defendant, Armon Thompson? |
| 23 | | THE COURT: Record will so reflect. |
| 24 | Q | (By Ms. Otto) Mr. Campbell, before we go too far into |
| 25 | | this, I'm going to ask you about your criminal history briefly. |

46

```
 1    Okay?

 2    A      All right.

 3    Q      Can you tell us what your felony -- do you have any

 4    felony convictions?

 5    A      Yes.

 6    Q      Can you tell us what those felony convictions are for?

 7    A      Right now?

 8    Q      Convictions -- yes.  What convictions do you currently

 9    have right now?

10    A      Conspiracy to distribute.

11    Q      That's the case that you're -- that you're being

12    prosecuted for right now; is that correct?

13    A      Yes, ma'am.

14    Q      And we'll talk about that one in one second.  In

15    addition to that case, have you ever been convicted of any

16    other crimes?

17    A      Is probation being convicted?

18    Q      If it was a felony, yeah.  We'll talk about those.

19    Maybe I can help you here.  Back in 2005 did you plead guilty

20    to a felony in Clay County Circuit Court for possession with

21    intent to distribute?

22    A      Yes.

23    Q      And did you receive five years, suspended for five

24    years but five years of probation?

25    A      Yes.
```

1   Q       And then in 2009 did you get a second felony conviction
2   for possession of a controlled substance in Jackson County
3   Circuit Court?
4   A       Yes.
5   Q       And in that case were you given a seven-year sentence
6   with three years of probation?
7   A       Yes.
8   Q       And during 2010 was your probation suspended?
9   A       Yes.
10  Q       Were you placed in violator status?
11  A       No, ma'am.
12  Q       Was your probation suspended because you picked up the
13  new federal case here?
14  A       Yes.
15  Q       And the federal case here you indicated, was that the
16  violation of a conspiracy to distribute 5 kilograms or more of
17  a mixture of substance containing cocaine and 50 grams or more
18  of a mixture of substance containing cocaine base?
19  A       Yes.
20  Q       And have you pled guilty to that conspiracy --
21  A       Yes.
22  Q       -- case?  I'm going to show you what has been marked as
23  Government's Exhibits 1, 2, and 3, and I want you to take your
24  time and take a look at these and see if you recognize what
25  they are.  There's Exhibit Nos. 1, 2, and 3.

48

1    A       Yes.

2    Q       Do you recognize these documents?

3    A       Yes.

4    Q       I'm going to show you first Exhibit No. 1.  This is

5    labeled plea agreement and on the back page, which is page 14

6    of the plea agreement, appears your signature Justin Campbell;

7    is that correct?

8    A       Yes.

9    Q       Also your attorney, John Osgood, as well as the

10   prosecutor, Brent Venneman, signed it?

11   A       Yes.

12   Q       That is where you pled to that conspiracy count we just

13   discussed?

14   A       Yes.

15   Q       Then Exhibit 2, this is listed as a confidential

16   supplement to a plea agreement.  Do you recognize that?

17   A       Yes.

18   Q       And, again, on the last page of it, page 5, did you

19   sign that agreement?

20   A       Yes.

21   Q       As well as your attorney?

22   A       Yes.

23   Q       And the Assistant U.S. Attorney, Brent Venneman?

24   A       Yes.

25   Q       Then Exhibit 3, this is what's commonly referred to as

49

1    a Kastigar letter or a letter establishing your proffer session

2    with the government; and, again, on page 4, the last page, it's

3    signed by you, Mr. Campbell, and your attorney, John Osgood?

4    A      Yes.

5    Q      As well as Mr. Venneman's electronic signature appears

6    there?

7    A      Yes.

8    Q      And what is your understanding about how these

9    documents -- what are these documents for, do you know?

10   Actually I'll withdraw that question because it was probably a

11   poorly worded question.

12            MS. OTTO:  Before I do that I'm going to ask for

13   admission of Exhibits 1, 2, and 3.

14            MR. MOSS:  No objection, Your Honor.

15            THE COURT:  Received.

16   Q      (By Ms. Otto)  Now, Mr. Campbell you did plead guilty

17   to conspiracy like we discussed?

18   A      Yes.

19   Q      And what sentence range could you potentially receive

20   in your case?

21   A      Ten to life.

22   Q      Ten years to life?

23   A      Yes.

24   Q      And you agreed in the Kastigar letter to sit down with

25   the government and provide truthful information that you had in

```
 1   your possession; is that right?

 2   A      Yes.

 3   Q      And also you executed a confidential supplement to the

 4   plea agreement, and what -- are you required to testify

 5   truthfully here based on the confidential supplement agreement?

 6   A      Yes.

 7   Q      And have you agreed to assist the government in

 8   prosecuting Mr. Thompson and any other individuals that you may

 9   have information about?

10   A      Yes.

11   Q      And, in fact, you testified once before in St. Claire

12   County; is that right?

13   A      Yes.

14   Q      Is that -- what type of case was that in?

15   A      A murder case.

16   Q      And how did you -- was that also information you

17   received while you were incarcerated at St. Claire County?

18   A      Yes.

19   Q      You gave information to authorities there and you

20   testified in that case?

21   A      Yes.

22   Q      Has anyone made you any promises to testify here today?

23   A      No.

24   Q      Did anyone make any promises to testify in the St.

25   Claire homicide case?
```

```
1    A      No.

2    Q      I'm going to ask you about an interview you gave to a

3    detective back on October 20th, 2011.  Do you recall talking

4    with detectives with the St. Joseph Police Department about

5    your cellmate, Armon Thompson?

6    A      Yes.

7    Q      Can you tell us what you told them about Mr. Thompson?

8    A      When you say -- just everything?

9    Q      Yes.  Tell us about what you know about Mr. Thompson,

10   yes.

11   A      That he had told me that he was in a drive-by shooting.

12   Q      Did he indicate he was the victim of the drive-by

13   shooting or involved in committing the drive-by shooting?

14   A      Involved.

15   Q      When you say you and Mr. Thompson were cellees,

16   cellmates, how many people were in the cell with you and Mr.

17   Thompson?

18   A      I think it was four, then it was three.  It's a

19   four-man cell.

20   Q      Okay.  And so at one time it was you and Mr. Thompson

21   and at least one other person?

22   A      Yes.

23   Q      Another time it was you and Mr. Thompson and two other

24   people?

25   A      Yes.
```

1   Q      Tell me how Mr. Thompson began to talk to you about
2   this drive-by shooting.
3   A      Say that one more time.
4   Q      Can you tell us about the first conversation you had
5   with Mr. Thompson about the drive-by shooting?
6   A      He was just telling me that his friend was locked up
7   for a murder and that they had actually did a drive-by
8   shooting.  It was on the news and he was hoping that his friend
9   didn't actually tell on him.
10  Q      Did he indicate what that friend's name was?
11  A      If I'm not mistaken, I think his name was Calvin.
12  Q      And he indicated that he hoped his friend had not told
13  on him?
14  A      Yes.
15  Q      Did he tell you anything about any potential witnesses
16  to that drive-by shooting?
17  A      Yes.  He said there was a girl there.
18  Q      He said there was a girl there?
19  A      Yeah, but she had moved out of town or something like
20  that.
21  Q      Did he tell you that girl's name?
22  A      No, ma'am.
23  Q      Did he tell you whether or not he had any relationship
24  with that female at all?
25  A      No, ma'am.

1    Q        Did he tell you about what he and Calvin had done

2    immediately after the drive-by shooting in St. Joseph,

3    Missouri?

4    A        Yes.  He said that they had went to his mother's house.

5    Q        Did he say where his mother's house was located?

6    A        If I'm not mistaken, I think he just said Kansas City.

7    I'm not for sure.

8    Q        And did he indicate that's where he was arrested from

9    in his mother's house?

10   A        Yes.

11   Q        And did he talk about whether or not there was any

12   firearms at the house when he was arrested?

13   A        Yes.

14   Q        What did he tell you?

15   A        He said there was four firearms which two of them was

16   the murder weapons.

17   Q        And he said that Calvin had been charged with that

18   murder?

19   A        Yes.

20   Q        Did he make any statements about whether or not he was

21   hoping the lab would not come back with his fingerprints for

22   DNA on any of the guns?

23   A        Yes, ma'am.

24   Q        What did he tell you, do you remember?

25   A        He said he hoped that his fingerprints or DNA wasn't on

1   the weapons that they had found.

2   Q       How many conversations did you have with Mr. Thompson

3   about this drive-by shooting?

4   A       Maybe three.

5   Q       And so the first time you spoke with him did he tell

6   you all this information or did it kind of come out piece by

7   piece?

8   A       Piece by piece.

9   Q       Is it common for inmates to discuss their criminal

10  matters while they are in custody?

11  A       Is it common?

12  Q       Yes.

13  A       I wouldn't -- I don't know if you want to call it

14  common.  I don't think it's wise but I don't think that it's

15  common.

16  Q       Have there been any discussions in your cell about

17  whether or not you guys should discuss your cases or not?

18  A       Yes, ma'am.

19  Q       Tell us about those kind of conversations.

20  A       Another one of my cellees was saying you shouldn't

21  discuss open cases with each other.

22  Q       Was Mr. Thompson there at that time?

23  A       Yes, ma'am.

24  Q       And despite that, did Mr. Thompson still speak with you

25  about his case?

```
1    A        Yes, ma'am.

2    Q        And did you ever have the opportunity to review any of

3    the discovery in Mr. Thompson's case?

4    A        Any who?

5    Q        Any of the discovery, the reports or information

6    related to the case?

7    A        No, ma'am.

8    Q        Did you have a chance to review any of the discovery or

9    reports in Calvin -- in his friend Calvin's case?

10   A        No, ma'am.

11   Q        Is it difficult for you to come here to testify today?

12   A        Very.

13   Q        Tell us what makes it difficult.

14   A        Well, for one I'm like from the street and I don't

15   really like to actually testify against people, and for two, I

16   was almost like taking a liking to him, so I think that's the

17   most hard part.

18   Q        Are you concerned at all for your safety?

19   A        And, yes.  I'm sorry about that.  That should be the

20   No. 1 thing about the safety of me and my family.

21   Q        Okay.  Not should be but is that a concern of yours?

22   A        Most definitely.

23   Q        Why is that a concern of yours in Mr. Campbell's case?

24   A        In who?

25   Q        I'm sorry.  In Mr. Thompson's case.  Why is that a
```

1     concern of yours in Mr. Thompson's case?

2     A     Because he's from Kansas City and I know he has a lot

3     of siblings that's out there.

4     Q     Did you ever hear any information or anything said to

5     you about testifying in today's hearing?

6     A     Yes.

7     Q     And tell us about that.

8     A     Some people was telling me that he was saying how his

9     brothers was going to kill me and things of that nature.

10    Q     And are you still currently housed in the St. Claire

11    County jail?

12    A     Yes.

13    Q     And, to your knowledge, Mr. Thompson still housed in

14    the St. Claire County jail?

15    A     I actually found out that he's not.

16    Q     He's not there anymore?

17    A     No.

18    Q     I'm going to show you Government's Exhibit No. 4, and

19    take a look at that and tell me if you recognize that.

20    A     Yes.

21    Q     What is Exhibit No. 4?

22    A     You say what is it?

23    Q     Yes.

24    A     A statement.  My statement.

25    Q     It's your statement?

```
 1    A        Yes.

 2    Q        That we've been talking about here today?

 3    A        Yes.

 4    Q        And it's given October 20, 2011, to Detective Coates?

 5    A        I can't remember the detective's name but, yes, it is a

 6    detective.

 7    Q        But to a detective?

 8    A        Yes.

 9             MS. OTTO:  I'm going to move for admission of

10    Exhibit No. 4.

11             MR. MOSS:  No objection.

12             THE COURT:  Received.

13    Q        (By Ms. Otto)  Mr. Campbell, have you ever been to St.

14    Joseph, Missouri?

15    A        No, ma'am.

16    Q        Had you ever heard about any homicides in St. Joseph,

17    Missouri, until recently?

18    A        No, ma'am.  I think he told me something about it was

19    on the news or something like that, but I have never been

20    there.

21             MS. OTTO:  No further questions.

22    CROSS-EXAMINATION BY MR. MOSS:

23    Q        Mr. Campbell, I think you testified that you have been

24    convicted of several felony convictions; is that correct?

25    A        Yes.
```

```
1    Q       And all of those have involved drug distribution?

2    A       Yes.

3    Q       Is it fair to say you're a drug dealer by trade?

4    A       No.  I wouldn't say by trade, no.

5    Q       Okay.  You were convicted in 2005 with possession with

6    intent to distribute crack cocaine?

7    A       2005?  No, that wasn't -- no, that was marijuana.

8    Q       Marijuana in 2005.  That was the intent to distribute?

9    A       Yes.

10   Q       And then you were convicted again in 2010.  Now, that

11   was just a possession of a controlled substance, right?

12   A       Yes.

13   Q       But in that case there were 20 baggies, small baggies

14   of crack cocaine in that case?

15   A       Yes.

16   Q       So even though you got a C felony, you'd also agree

17   that was also, in a sense, a distribution case?

18   A       No.  No.

19   Q       You wouldn't?

20   A       No.  No, sir.

21   Q       Are you saying all those 20 baggies were for your own

22   personal use?

23   A       Yes, sir.  Not personal.  Not all of them.  I would

24   sell some for my personal use and to -- when I sell it, I have

25   money to go get some more.
```

```
1    Q      Okay.  Well, I know that you were -- it was just
2    possession of a controlled substance because it was under 2
3    grams of crack cocaine, right?
4    A      Yes.
5    Q      And I think it was 20 baggies, correct?
6    A      If my memory serves me correct, yes.
7    Q      What I'm asking is, were at least some of those baggies
8    intended for distribution?
9    A      At least some --
10          MS. OTTO:  Your Honor, I'm going to object.  The
11   conviction that he's been convicted of is possession of a
12   controlled substance and that's been established.
13          THE COURT:  Overruled.
14   Q      (By Mr. Moss)  I guess I'm asking, were some of those
15   20 baggies intended for distribution?
16   A      Yes, sir.
17   Q      All right.  And then you were convicted in 2011 in
18   federal court; is that right?
19   A      Yes.
20   Q      Last year.  And that was conspiracy to distribute more
21   than 5 kilograms of powder and more than 50 grams of cocaine
22   base?
23   A      Yes, sir.
24   Q      You know cocaine base to be crack cocaine?
25   A      Yes, sir.
```

```
1    Q        And you understand that drug dealing can involve

2    violence?

3    A        No, I don't understand that.

4    Q        Well, you did possess guns in the course of that

5    conspiracy, correct?

6    A        Say that one more time.

7    Q        You did possess guns during the course of that

8    conspiracy?

9    A        No.  I didn't possess guns, no, sir.

10   Q        You never tried to sell any guns?

11   A        There was a gun found at my house, yes.

12   Q        Okay.  All right.  Let me try to clarify.  So you admit

13   to handling that gun, but you're saying that gun didn't belong

14   to you; is that right?

15   A        Yes.  That's right.

16   Q        And did you ever have a conversation with -- do you

17   know, is it Brian Hampton?

18   A        Sean Hampton.

19   Q        Scott Hampton.

20   A        Sean Hampton.

21   Q        Sean Hampton?

22   A        Yes.

23   Q        Did you ever have a conversation with him about trying

24   to sell some guns you had?

25   A        It wasn't mine, but, yes, I was trying to sell him guns
```

1  from a friend, yes.

2  Q      You indicated to him that you had two to three -- was

3  it two or three guns?

4  A      I think there was three.

5  Q      Okay.  So you will sell guns but you don't own any

6  guns; is that your testimony?

7  A      I would help a friend to sell guns, yes.

8  Q      Okay.  Now, you indicated -- well, you say a friend.

9  He's also a co-conspirator, right?

10  A      No, not on my case.  What I was doing is I was helping

11  a friend try to sell some guns to my co-conspirator.

12  Q      All right.  Now, you also possessed a bulletproof vest

13  at your house?

14  A      Yes, sir.

15  Q      And you told police you thought that was a paintball

16  vest?

17  A      Yes, I did.

18  Q      And was that the truth?

19  A      I really actually thought it was.  Yes, that was the

20  truth.

21  Q      Okay.  So you had a bulletproof vest and even today

22  you're maintaining you thought that was just something people

23  wear for paintball?

24  A      Even today, yes, sir.

25  Q      Do you paintball?

1    A       Yes, sir.

2    Q       Do you have any paintball equipment at your house?

3    A       I didn't actually own any.  I only went one time, one

4    or two times.  Yeah, one or two times.

5    Q       Where did you go?

6    A       It was out in North Kansas City.  I'm not exactly

7    familiar with the address but I know it's in North Kansas City.

8    Q       Is that why you purchased a bulletproof vest that you

9    thought was a paintball vest?

10   A       No.  Actually it was just sold to me.  It was sold and

11   when I got it, they told me it was a paintball -- a paintball

12   vest.

13   Q       Okay.  So you bought that vest because you planned on

14   going paintballing in the future?

15   A       Yes, sir.

16   Q       And you had been one time before?

17   A       Couple times.

18   Q       How much did you buy it for?

19   A       If I'm not mistaken, I think I gave them like $20.

20   Q       $20.  Okay.  And the federal offense, that was

21   committed while you were on probation for the 2010 SES

22   probation, right?  At least part of it was committed while you

23   were on probation?

24   A       Yeah, I would say part of it.  They started doing an

25   investigation before I got on probation, yes.

1    Q      Then after you got probation, you continued to be

2    involved in drug activity that led to your federal indictment?

3    A      Yes.  Yes.

4    Q      And you would agree that probation is an agreement that

5    you have with the sentencing court; is that your understanding?

6    A      Say that one more time.

7    Q      Would you agree that probation is like an agreement you

8    have with the sentencing judge or the sentencing court?

9    A      Yes.

10   Q      And generally in order -- I mean, generally the

11   agreement is you avoid going to prison in exchange for abiding

12   by certain rules or regulations?

13   A      Yes.

14   Q      Okay.  So you get to stay out of prison but then you

15   have to do certain things while you're on probation, right?

16   A      Right.

17   Q      Those are called conditions of probation?

18   A      Yeah.

19   Q      And that one controlled substance conviction, you were

20   granted probation on March 30th of 2010?

21   A      I'm not a hundred percent sure today.

22   Q      Okay.  If I told you that your presentence

23   investigation indicated that you were convicted or pled guilty

24   and you were sentenced to an SES on March 30th, 2010, on

25   page 20 of paragraph 79, would you disagree with that?

1   A      I probably don't.

2              MR. MOSS:  Can I approach the witness, Your Honor?

3              THE COURT:  You may.

4   Q      (By Mr. Moss)  Okay.  I'm just going to show you -- do

5   you recognize that as being page 1 of your presentence

6   investigation?

7   A      Yes.

8   Q      You're Justin J. Campbell?

9   A      Yes, sir.

10  Q      If I turn to page 20, paragraph 79, that's the C felony

11  SES probation that you were granted?

12  A      Yes, sir.

13  Q      It looks like that was granted on March 30th of 2010?

14  A      Yes, sir.

15  Q      And you didn't have any objections to your PSI, right?

16  A      No, sir.

17  Q      And do you remember appearing in front of Judge Beaird

18  to get that probation?  Do you remember the name of the judge

19  that gave you probation?

20  A      No, sir, I don't remember the name.

21  Q      But by taking probation, you did agree to abide by the

22  conditions of probation?

23  A      Yes, sir.

24  Q      And you would agree at least one, if not the most

25  important, condition is that you don't commit any more crimes,

1  right?  That's a pretty important condition?

2  A      Right.

3  Q      But on that very day that you took probation from Judge

4  Beaird, you made a phone call to purchase an ounce of cocaine.

5  Do you recall doing that?

6  A      No, but if you got it on the PSI, then --

7  Q      Okay.

8          MS. OTTO:  I'm sorry to interrupt you, Mr. Moss.  I

9  want to object to this line of questioning.  Mr. Moss is

10  getting into the offense conduct for Mr. Campbell's current

11  conspiracy case.  He's admitted to pleading guilty to a

12  conspiracy.  He's admitted to the previous convictions of

13  felony convictions.  I think that is firmly established in the

14  record, and so, you know, going line by line of the offense

15  conduct for which he's pled guilty, I don't think it's

16  necessary and really relevant at this point.

17          THE COURT:  How far do you want to go into this?

18          MR. MOSS:  I'm almost done.  I'm almost done, Judge.

19  It relates to credibility and I'm going to get to this pretty

20  quickly.

21          THE COURT:  I mean, I really think you've

22  established what you're seeking to establish, but I'll give you

23  just a little more latitude.

24          MR. MOSS:  I'll be very quick, Your Honor.

25          THE COURT:  Thank you.

```
 1   Q       (By Mr. Moss)  If I could approach and show you what's

 2   been marked, I think this is Government's Exhibit 7.  Do you

 3   recognize this as the plea agreement that's been admitted as

 4   Government's Exhibit 1?

 5   A       Yes.

 6   Q       Okay.  So on Government's Exhibit 1, the very bottom

 7   there it indicates that on March 30th you were involved in a

 8   deal to purchase an ounce of cocaine?

 9   A       Yes.

10   Q       Okay.  And that's the very day that you got probation

11   on this other case, correct?

12   A       Yes.

13   Q       And I'm going to show you what's been marked on your

14   PSI, again, this is at page 12 on paragraph 42.  It says there

15   was a phone call at approximately 1 p.m. that day?

16   A       Uh-huh.

17   Q       That's all in your plea agreement.  You've already

18   admitted and agreed to all of that, right?

19   A       Yes.

20   Q       Were you at the courthouse when you set up that drug

21   deal?

22           MS. OTTO:  Your Honor, I object again.

23           THE COURT:  Sustained.

24   Q       (By Mr. Moss)  Is it fair to say, without getting into

25   specifics, that you do have a history of lying to the police?
```

1          MS. OTTO:  I'm going to object again.

2          MR. MOSS:  Well, this would be credibility, Judge.

3          THE COURT:  Lying to the police or the Court or --

4          MR. MOSS:  I was doing the Court.  Now I'm on to the

5   police.  I can direct him further.  I'm just trying to kind of

6   be a little conclusory or general.

7          THE COURT:  Are these matters you've already

8   established?

9          MR. MOSS:  Well, Judge, I'm not going to lay a

10  foundation.  If the Court would like me to lay a foundation for

11  the question.

12         THE COURT:  No, I wouldn't really like you to.

13         MR. MOSS:  It all goes to credibility, Your Honor.

14  I'm trying to establish that this --

15         THE COURT:  Well, ask him if he lied to the police

16  before.

17  Q      (By Mr. Moss)  Okay.  Mr. Campbell have there been

18  occasions where you've lied to the police?

19  A      Yes.

20  Q      Okay.  Prior convictions where you've given false names

21  and false identifiers, things like that?

22  A      Yes.

23         MS. OTTO:  Your Honor, I'm going to object.  This is

24  getting into misdemeanor convictions.  He admitted that he's

25  done them in the past.

68

```
1              THE COURT:  Overruled.

2    Q       (By Mr. Moss)  And specifically in the federal case

3    here when you were first arrested, you gave a false name at the

4    time of the offense?

5    A       On this federal case?

6    Q       I'm sorry.  Was that the one you got probation on, the

7    2010?

8    A       Maybe but not on this federal case.  No, I didn't give

9    false information.

10   Q       Okay.  I'm sorry.  This was the one where you were

11   arrested with 20 baggies of cocaine, you gave false

12   information?

13   A       Oh, yes.  Yes, I did.

14   Q       Okay.  Given your experience, is it fair to say that

15   you have a pretty good grasp of the system?  By the system, I

16   mean the criminal justice system?

17   A       What do you mean by that?

18   Q       Well, are you knowledgeable regarding the way cases can

19   be worked out and resolved?

20   A       Yes.

21   Q       Okay.  You indicated in your direct testimony that it's

22   a bad idea to discuss your case in jail, right?

23   A       Yes.

24   Q       And one reason it's a bad idea is because other people

25   can jump on your case as you're doing in this case, right?
```

```
1    A        Yes.

2    Q        So that's one reason it's a bad idea?

3    A        Yes.

4    Q        Okay.  And you understand that the best way -- or at

5    least a very effective way to reduce the time you're facing is

6    through testifying for the government?

7    A        Say that one more time.

8    Q        You understand that one way of reducing your sentence

9    is by testifying and helping the government in other cases?

10   A        Yes.  Yes.

11   Q        And you've done that both in your own federal case,

12   right?

13   A        Yes.

14   Q        And you also mentioned on direct that you testified in

15   another pending St. Claire case?

16   A        Yes.

17   Q        And this was against another cellmate of yours?

18   A        Yes.

19   Q        And your testimony -- was his name Daniel Thompson?

20   A        Yes.

21   Q        No relationship to Armon Thompson that you know of?

22   A        Not that I know of.

23   Q        And your testimony in that case is that this person,

24   Daniel Thompson, also confessed to these crimes or whatever

25   crime was charged with in that case?
```

70

```
1    A      Yes.

2    Q      And now you're testifying against Armon Thompson that

3    he also admitted things to you while he was in custody?

4    A      Yes.

5    Q      And in this case you would be facing a minimum sentence

6    of ten years; is that correct?

7    A      Yes.

8    Q      But you do have two prior drug felonies, correct?

9    A      Yes.

10   Q      Okay.  Was part of your deal for cooperating avoiding

11   what's called an 851 enhancement where you might be facing

12   mandatory life?

13   A      No.

14   Q      Was that discussed?

15   A      No, sir.

16   Q      You don't know anything about that?

17   A      What I do know is taking a plea stopped them from

18   851'ing me, yes.

19   Q      Okay.  All right.  So you were facing an 851 of

20   possibly mandatory life but for the plea agreement?

21   A      Say that one more time.

22   Q      You were facing an 851 enhancement?

23   A      Uh-huh.

24   Q      And you avoided that?

25   A      By taking a plea.
```

71

```
 1   Q      By pleading guilty?

 2   A      Yes, sir.

 3   Q      But the cooperation didn't have anything to do with the

 4   851 enhancement?

 5   A      They didn't tell me that it was.

 6   Q      Okay.  All right.  You were cellmates with Mr. Thompson

 7   for about two months?

 8   A      Yes, sir.

 9   Q      And during that time you did have access to his legal

10   materials?

11   A      No.  I mean, I never -- he never showed any --

12   Q      He has legal papers and materials however, correct?

13   A      I would guess, yes.

14   Q      Well, did you ever see him with legal materials or

15   legal papers?

16   A      No, sir.

17   Q      You said Mr. Thompson said he was involved in doing a

18   drive-by shooting in your testimony here today?

19   A      Yes.

20   Q      Did he say he was the driver?

21   A      He didn't go into details to say who was driving and

22   who wasn't.

23   Q      Did he say he was the shooter?

24   A      He didn't never necessarily say that he was the shooter

25   neither.
```

| 1 | Q | Did he say he possessed a gun during that drive-by? |
| 2 | A | No. What he said was they did a drive-by. |
| 3 | Q | Did he -- did he mention who they was? |
| 4 | A | Yes. Him and his friend. |
| 5 | Q | And I think you identified a person named Calvin as his |
| 6 | | friend? |
| 7 | A | Yes. |
| 8 | Q | Did he say that he and Calvin were the only people in |
| 9 | | the car? |
| 10 | A | Now, that's what I'm not too for sure about. I don't |
| 11 | | know if he was saying that a girl was actually with them or a |
| 12 | | girl actually witnessed the shooting. |
| 13 | Q | Did he say who the victim was? |
| 14 | A | No, he didn't go into that neither. |
| 15 | Q | Now, you testified today that you had about three |
| 16 | | conversations with Mr. Thompson about this? |
| 17 | A | Yes. |
| 18 | Q | Now, do you still -- do you have Government's Exhibit 4 |
| 19 | | up there, your written statement? |
| 20 | A | Yes. |
| 21 | Q | If you look at the second paragraph, doesn't that say, |
| 22 | | One night Armon got to talking? |
| 23 | A | Uh-huh. |
| 24 | Q | Do you say anything about there being three |
| 25 | | conversations in your written statement? |

```
 1    A       No.

 2    Q       And, I mean, it looks like from the written statement

 3    it was on one occasion Mr. Thompson apparently told you these

 4    things?

 5    A       What I did is summed it all up and put it in my

 6    statement here.

 7    Q       You just didn't say it, that there was three different

 8    times that he talked to you about this?

 9    A       No.

10    Q       Okay.  I'm going to --

11            MR. MOSS:  May I approach the witness again, Your

12    Honor?

13            THE COURT:  Yes.

14    Q       (By Mr. Moss)  I'm going to show you what's been marked

15    as Defense Exhibit 9 and just ask you, have you ever seen that

16    document before?

17            MR. MOSS:  Just for the Court's reference, this

18    Defense Exhibit 9 is an affidavit filed with the complaint in

19    this case.

20    A       No, sir.

21            MR. MOSS:  Can I have one second, Your Honor?

22            THE COURT:  Yes.

23            MR. MOSS:  Judge, I don't have any further

24    questions.

25            THE COURT:  Ms. Otto.
```

```
 1              MS. OTTO:  Very briefly, Your Honor.
 2    REDIRECT EXAMINATION BY MS. OTTO:
 3    Q      Mr. Campbell, you admitted you have drug convictions;
 4    is that right?
 5    A      Yes.
 6    Q      And you're obviously in custody because of your drug
 7    activities; is that right?
 8    A      Yes, sir.
 9    Q      And you have pled guilty and accepted responsibility in
10    your involvement in the drug conspiracy in the Western District
11    of Missouri?
12    A      Yes.
13    Q      And you're housed at St. Claire County?
14    A      Yes.
15    Q      And did you ask to be cellmates with Armon Thompson?
16    A      No.
17    Q      Did you know Armon Thompson prior to him being assigned
18    to your cell back at St. Claire County?
19    A      No.
20    Q      Did you hear anything about this murder on the news?
21    A      No.
22    Q      Did you ever read the affidavit that Mr. Moss just
23    showed you?  Had you ever seen that before in your life?
24    A      No.
25    Q      Have you ever read Mr. Thompson's discovery?
```

```
 1    A       No.

 2    Q       Have you ever seen any legal papers that Mr. Thompson

 3    had?

 4    A       Not at all.

 5    Q       Part of your agreement with the government is to

 6    testify truthfully; is that correct?

 7    A       Yes.

 8    Q       And have you testified truthfully here today?

 9    A       Yes.

10    Q       And Mr. Moss asked you one way to reduce your sentence

11    is to testify.  Has any promises or guarantees been made to you

12    about any particular sentence that you are going to receive?

13    A       No, ma'am.

14    Q       Or any percentage off of your sentence that you may

15    receive?

16    A       No, ma'am.

17            MS. OTTO:  I have nothing further.

18            THE COURT:  Mr. Moss.

19            MR. MOSS:  Just briefly, Your Honor.

20    RECROSS-EXAMINATION BY MR. MOSS:

21    Q       The government asked you if you agreed to testify

22    truthfully and you said yes, correct?

23    A       Yes.

24    Q       On March 30th when you told the judge you would take

25    probation --
```

1          THE COURT:  Mr. Moss, it's not a jury trial.

         2          MR. MOSS:  All right, Judge.

         3          THE COURT:  He lied to the judge at that time.

         4          MR. MOSS:  Okay.  All right, Judge.  That's fine.

         5   That's the only other point I wanted to bring home to the

         6   Court.  I don't have any further questions, Your Honor.

         7          MS. OTTO:  Nothing further of this witness.

         8          THE COURT:  Thank you, Mr. Campbell.

         9          MS. OTTO:  May he be excused?

        10          THE COURT:  Yes.

        11          (Witness excused.)

        12          THE COURT:  Anything else, Ms. Otto?

        13          MS. OTTO:  No, Your Honor.

        14          THE COURT:  And, Mr. Moss, any evidence from you?

        15          MR. MOSS:  Judge, we would move to admit Defense

        16   Exhibit 9.  This is the affidavit that recounts the vast

        17   majority of the information that's contained within the written

        18   statement.  Although I can tell the Court I don't provide

        19   copies of discovery to defendants, I do routinely give them

        20   legal documents that have been filed.  This was the affidavit

        21   that accompanied the complaint which -- I suppose I can lay

        22   some foundation that he had a copy of it in his materials if

        23   the Court wants me to do that.

        24          THE COURT:  I'll take your word for it, but if you

        25   put the defendant on, he's subject to cross-examination.

                                        77

1              MR. MOSS:  I would try to figure out another way to

         2     do it, Judge, so I move for admission -- it is a court document

         3     as well so I move for admission of that, Your Honor.

         4              MS. OTTO:  Your Honor, judicial notice can be taken.

         5     It's an affidavit attached to the complaint.

         6              THE COURT:  I agree.

         7              MS. OTTO:  So I'm not going to object.

         8              THE COURT:  Let me see it.  It's received.

         9              Thank you, Mr. Moss.

        10              Anything further, Mr. Moss?

        11              MR. MOSS:  Judge, the only other thing is I would

        12     make a proffer -- which I do have Mr. Bush here.  I just make a

        13     proffer that it is our practice as an office not to give copies

        14     of discovery to clients, but we do have a practice of providing

        15     legal documents to defendants.  Mr. Bush is here to testify if

        16     the Court or if the government has any questions about that.

        17              THE COURT:  You don't question Mr. Moss' position on

        18     that do you, Ms. Otto?

        19              MS. OTTO:  No, I do not, Your Honor.

        20              THE COURT:  Thank you, Mr. Moss.  Your proffer is

        21     accepted, and I accept the fact that you do not provide

        22     discovery to defendants but you would have provided the

        23     affidavit attached to the indictment.

        24              MR. MOSS:  Yes, Your Honor, that's correct.

        25              THE COURT:  Anything else?

1    MR. MOSS:  Judge, I don't believe there are any

2    other exhibits.  I don't believe there's any other evidence

3    that we would like to present at this time.

4    THE COURT:  All right.  Thank you.

5    Well, the affidavit goes into quite a bit of detail

6    that was not part of Mr. Campbell's testimony.  I believe that

7    Mr. Campbell's testimony was credible given the information

8    that he provided, and I accept his testimony.

9    Also I believe that his testimony is supported by

10   the physical evidence, the guns that were actually found, where

11   they were, where the incident took place, where Mr. Thompson

12   and Calvin -- I already lost track of his last name.  I could

13   look it up -- where they went after the drive-by shooting, the

14   fact the two of them were together.  I, therefore, overrule

15   your objection to the enhancements under paragraphs 22 and 23

16   of the presentence report.

17   And I believe that you have one other objection.

18   Yes.  You objected to Mr. Thompson's -- well, page 14,

19   paragraph 49 representing that Mr. Thompson is a gang member.

20   Do you have anything further you want to offer on that?

21   MR. MOSS:  No, Your Honor.

22   THE COURT:  Ms. Otto, do you have anything on that

23   other than the evidence that's already been presented?

24   MS. OTTO:  No.  We'll stand on the evidence that's

25   been presented.

1          THE COURT: All right. That objection does not have

 2     any application to the sentencing guidelines, but I will

 3     overrule your objection.

 4          Given my rulings on those -- on your objection to

 5     the enhancements, Mr. Thompson's total offense level under the

 6     sentencing guidelines is 35. His criminal history category is

 7     IV. The guidelines recommend consideration of a range up from

 8     235 to 293 months. However, there's a ten-year statutory

 9     maximum.

10          Mr. Moss, would you like to speak to what you feel

11     would be an appropriate sentence?

12          MR. MOSS: Yes, Your Honor. Just as a point of

13     clarification, I understand the guideline range is higher, much

14     higher than the statutory maximum. However, I believe in that

15     situation the guideline range does become ten years. Now,

16     certainly I'm not -- I'm not saying the Court cannot consider

17     the other evidence at the sentencing, but I don't believe we're

18     in a position where we have to seek a variance or departure

19     from 320-whatever months it is.

20          THE COURT: I agree.

21          MR. MOSS: Okay. Judge, certainly Mr. Thompson is

22     at the ten-year maximum. I would ask for a sentence of

23     somewhere between seven -- around seven years, and there's a

24     couple of reasons for that, Your Honor.

25          First of all, Mr. Thompson did plead guilty.

1  Certainly that sort of conduct should be rewarded.  We did
2  avoid a trial.  We did save the prosecution a lot of time.  We
3  saved the Court at least a couple days.  We did conserve
4  resources.  That is something that should be rewarded and that
5  is something we want to encourage in the system.  So we would
6  ask for a sentence -- we think that is a mitigating factor.

7          Another thing, Judge, more specific to the facts and
8  that's based on what the evidence the Court has heard today.
9  Even with the Court's overruling of the objection, the fact
10  remains that the testimony is he was with Calvin Ford or he was
11  involved in this with Calvin Ford.  There is -- not only is
12  there no direct evidence, I would submit that all the evidence
13  in the case that Calvin Ford was the shooter and that as well
14  he was the driver.

15          There's also, through the written statements,
16  testimony that there may have been as many as four or five
17  people in that vehicle.  So even if you assume that the -- that
18  Mr. Campbell was truthful and credible, as the Court has made
19  that determination, the fact remains what you have here is Mr.
20  Thompson being in a car that was involved in the shooting.
21  He's not the shooter.  He's not the driver.  And there's no
22  specific evidence that he did anything to encourage or aid and
23  assist other than being there.

24          Now, certainly the Court can draw its own
25  conclusions about his presence --

1          THE COURT:  But he fled with Mr. Ford.  He assisted

2     in concealing the commission of that offense.  He expressed

3     concern that his fingerprints or DNA would be found on the

4     weapons.

5          MR. MOSS:  Judge, I know he was apprehended about 48

6     hours after the offense.  I don't think -- I mean, certainly I

7     think that's consistent with him being some sort of an

8     accessory after the fact, and certainly there's an association

9     there, but what I'm telling the Court is all the evidence the

10    Court's heard is that Calvin Ford was the shooter; that there

11    was two different shootings; that they all came from the

12    driver's side of the window.  There's a big difference between

13    someone that commits a murder and someone that's an accessory

14    after the fact, and I think the other comments that he made

15    certainly are consistent with that, with that sort of

16    situation.

17         So, Judge, I think there is a difference there, and

18    based on that difference in the evidence as well as based on

19    the fact that we do have a plea here, a sentence of seven years

20    is what we request.

21         Thank you.

22         THE COURT:  Thank you, Mr. Moss.

23         Mr. Thompson, is there anything you would like to

24    say this afternoon?

25         THE DEFENDANT:  I would like to ask the Court to

1    have mercy on me.  I know I made some bad decisions, but I

2    didn't partake in no offenses that's been talked about today

3    other than I pled guilty.  I was guilty of possessing firearms,

4    mere possession.  I would ask if you can have mercy on me and

5    my family.

6                THE COURT:  Thank you, Mr. Thompson.

7                Ms. Otto.

8                MS. OTTO:  Your Honor, the government is asking that

9    Mr. Thompson be sentenced to the statutory maximum of 120

10   months as outlined in the presentence report.  His guideline

11   range, but for the statutory maximum of this offense, would be

12   235 to 293 months.  So a sentence of 120 months being the

13   statutory maximum is still, you know, half of what he would be

14   looking at but for the statutory maximum in this case.

15               Mr. Moss has asked for some sort of leniency or

16   consideration for, you know, Mr. Thompson accepting

17   responsibility in this case, and I just want to point out back

18   on paragraph 6 of the presentence investigation report, as well

19   as at the time of the plea, Mr. Thompson really asserted that

20   he was only guilty of possessing the .22 caliber rifle; and,

21   Your Honor, that is significant to the government because that

22   indicates the government -- that Mr. Thompson knew that the

23   other firearms were more than likely involved in the homicide

24   or the shooting of Genea Weston, and so from early on in this

25   case he attempted to distance himself from those firearms

1  because he knew they were involved in other violent felony

2  offenses.

3           I'll remind the Court that the .45 caliber gun that

4  was found in the basement at 9732 along with Mr. Thompson, his

5  DNA was on that one definitively with I think a 1 in 20

6  unrelated individuals that was related to the Genea Weston

7  case.  So Mr. Thompson would only be willing to admit to the

8  one he knew was not involved in those violent felony offenses

9  in St. Joseph, Missouri.

10          I know Mr. Thompson has another juvenile matter.  It

11  was actually disposed of as a juvenile.  He also has, I

12  believe, a couple of other felonies as well.  One of them being

13  a violent offense, physically taking property from a victim.

14  That's paragraph 35.  He was placed on probation.  It was

15  revoked.  He was paroled.  He absconded on that parole.  He was

16  arrested and eventually revoked on that violent felony that he

17  received when he was 18.

18          Mr. Thompson, there was evidence he is a gang member

19  along with Calvin Ford.  The only people who know who shot what

20  gun that night were Mr. Ford and Mr. Thompson because they were

21  in the car.  We believe he was involved in the shooting and the

22  homicide in St. Joseph, Missouri, as well as the shooting of

23  Genea Weston in St. Joseph, Missouri.

24          For those reasons, Your Honor, we ask he be

25  sentenced to the maximum, that is 120 months on this offense.

```
 1              THE COURT:  Thank you.

 2              MR. MOSS:  Judge, just briefly.  I mean, the Genea

 3    Weston incident certainly, Judge, that's not contained in the

 4    PSI so we would object to the Court considering that.  I don't

 5    believe there's -- I know the Court heard evidence of it, and I

 6    guess technically I should have objected at the time it came

 7    in, but that wasn't what we prepared for, Your Honor.  I don't

 8    believe probation --

 9              THE COURT:  I won't consider that.

10              MR. MOSS:  Okay.  Judge, as to the argument that we

11    haven't accepted responsibility, I just want to point out

12    paragraph 21.  We did not object to that enhancement of him

13    being held responsible for all four firearms; and, Judge, at

14    the time of the plea we didn't have any of the lab work.

15    That's quite true.  But we chose to plead to a rifle that was

16    underneath papers that came back to Armon Thompson; and, Judge,

17    we pled and we certainly -- I was concerned about what's

18    happening in St. Joseph but I don't believe --

19              THE COURT:  It appears to me that Mr. Thompson's

20    accepted responsibility for the offense for which he was

21    charged.

22              MR. MOSS:  All right.  Thank you, Your Honor.

23              I think those are the only things I wanted to

24    address.

25              THE COURT:  All right.  Thank you.
```

1        MS. OTTO:  Judge, just so the record is clear, the

2   Genea Weston matter is referenced in the PSR in paragraph 9.

3        THE COURT:  All right.  Well, Mr. Thompson, you hang

4   out with people that go around shooting people, there's not

5   much good is going to come out of that.  I think it's pretty

6   clear that you were an associate of and involved with Mr. Ford,

7   and that's not a good thing to do.

8        I believe that taking into consideration all of the

9   factors set forth under 18 U.S.C. Section 3553, and probably

10  significantly the nature and characteristics of the offense and

11  the surrounding circumstances relating to the offense, your

12  history and characteristics, the need for the sentence to

13  reflect the seriousness of the offense, promote respect for the

14  law, provide just punishment, afford adequate deterrence to

15  criminal conduct, to protect the public from future crimes, as

16  well as the recommended range under the sentencing guidelines,

17  the statutory maximum, and all other statutory factors to be

18  considered, that a sentence of 120 months, ten years, is a

19  reasonable and appropriate sentence and I'm going to sentence

20  you accordingly.

21       And upon your release from that period of custody,

22  I'm going to order you be placed on supervised release for a

23  period of three years.

24       I find that you do not have the ability to pay a

25  fine.  I waive the imposition of any fine.  But you are ordered

1  to pay the United States a special assessment in the amount of

2  $100, which is due immediately.

3         Mr. Thompson, while you're on supervised release,

4  I'm going to order that you comply with all the mandatory and

5  standard conditions that have been adopted by this court for

6  supervision as well as these following special conditions:  You

7  are to provide the probation office with access to any

8  requested financial information.

9         You are to successfully participate in any substance

10  abuse counseling program, which may include urinalysis, sweat

11  patch, or Breathalyzer testing, as approved by the probation

12  office, and pay any associated costs as directed by the

13  probation office.

14         You'll submit your person and any property, house,

15  residence, office, vehicle, papers, computer, other electronic

16  communication or data storage devices or media and effects to a

17  search, conducted by a U.S. probation officer, at a reasonable

18  time and in a reasonable manner, based upon reasonable

19  suspicion of contraband or evidence of a violation of a

20  condition of release.  Any failure by you to submit to a search

21  may be grounds for revocation.  You will warn other residents

22  that the premises may be subject to searches pursuant to this

23  condition.

24         You will satisfy any warrants or pending charges

25  within the first 60 days of your supervised release.

87

1      You will comply with the Western District of

2  Missouri Offender Employment Guideline, which may include

3  participation in training, counseling, and/or daily job

4  searching as directed by the probation officer.

5      If not in compliance with the condition of

6  supervision requiring full-time employment at a lawful

7  occupation, you may be required to perform up to 20 hours of

8  community service per week until employed as approved or

9  directed by the probation office.

10      I'm going to order that you be retained in custody

11  for service of the sentence imposed.

12      And, Mr. Thompson, the judgment entry reflecting the

13  sentence in your case will be entered today, and that's

14  significant to you because you have only 14 days after the day

15  the judgment entry is entered to file a notice of intent to

16  appeal to preserve your right to appeal.  If you don't file

17  that notice within 14 days of today, your right to appeal will

18  be lost.

19      My clerk who is seated here right to my left has a

20  form that she will give you that you can use to file that

21  notice if that's something that you wish to pursue.  You can

22  certainly discuss it with Mr. Moss.  You need to understand

23  that it's your obligation and responsibility to file that

24  notice if you wish to preserve your right to appeal.

25      Mr. Moss, is there anything further that needs to be

1    addressed?

2              MR. MOSS:  No, Your Honor.  Thank you.

3              THE COURT:  Ms. Otto?

4              MS. OTTO:  Yes.  Two quick housekeeping matters.

5    The government would move to dismiss Count 2 at this time, as

6    well as we ask the writ be removed for Mr. Campbell.  The

7    marshals brought him up.

8              THE COURT:  All right.  Those requests by the

9    government are granted.

10             MS. OTTO:  Thank you, Your Honor.

11             THE COURT:  Thank you all.

12             (Adjournment)

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, Katherine A. Calvert, Registered Merit Reporter, hereby certify that I am a duly appointed, qualified, and acting official court reporter for the Western District of Missouri; that on March 7, 2012, I was present and reported all of the proceedings in UNITED STATES OF AMERICA, Plaintiff, vs. ARMON THOMPSON, Defendant, No. 10-CR-00348-GAF-1.



_____, RMR
            Registered Merit Reporter


Dated this 15th day of March, 2012.